**Rich PHILLIPS d/b/a Sappa Valley Alfalfa Farm, Respondent,**

v.

**CNS CORPORATION d/b/a Sharpe Land and Cattle Co., Appellant.**

No. WD 62001.

Missouri Court of Appeals, Western District.

March 16, 2004.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 27, 2004.

Application for Transfer Denied June 22, 2004.

John B. Morthland, Hannibal, MO, for appellant.

Scott L. Templeton, Kirksville, MO, for respondent.

Before: BRECKENRIDGE, P.J., and EDWIN H. SMITH and HOWARD, JJ.

VICTOR C. HOWARD, Judge.

Rich Phillips sued CNS Corporation, as owner of the Sharpe Land and Cattle Company, to collect money due on a contract for the delivery of alfalfa hay. CNS counterclaimed, bringing four counts, three of which sounded in breach of warranty and one that sounded in negligence. The trial court initially granted summary judgment on Phillips' contract claim, finding CNS owed in excess of $88,000 on the contract. After a venue transfer, the trial court granted summary judgment in Mr. Phillips' favor on all four counts of CNS's counterclaim; CNS now appeals from that summary judgment.

As set forth below, in applying the appropriate standard of review as provided in *ITT Commercial Finance Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371 (Mo. banc 1993), we conclude that the trial court erred in granting summary judgment for Phillips on CNS's counterclaim. We reverse and remand to the trial court.

## Background

In May of 1998, Phillips and CNS entered into a verbal contract, under which Phillips agreed to supply alfalfa hay to CNS's dairy farm in Lewis County, Missouri, known as "Sharpe Land and Cattle Company." Phillips shipped and CNS took delivery of multiple shipments of alfalfa hay between May 1998 and January 1999. In late December 1998 and January of 1999, CNS refused to pay Phillips for the hay.

Phillips filed suit to collect the money owed by CNS on the contract. CNS counterclaimed for Count I: "Breach of Express Warranty"; Count II: "Breach of Implied Warranty of Merchantability and Usage of Trade"; Count III: "Breach of Implied Warranty of Fitness"; and Count IV: "Negligent Production of Alfalfa Hay," which allegedly resulted in decreased milk production by CNS's dairy cattle. After Phillips moved for summary judgment on his claim, the trial court entered judgment in Phillips' favor in the

amount of $88,948.48. Thereafter, a change of venue was granted and the remainder of the case (CNS's counterclaim) was transferred to the Circuit Court of Boone County, Missouri.

Phillips then filed a motion for summary judgment on CNS's counterclaim. Phillips claimed he was entitled to summary judgment because (1) there was no substantial evidence that the hay he delivered was moldy at the time of delivery or that any measurable amount of moldy hay was fed to CNS's cattle; (2) CNS's claim of decreased milk production was too speculative to allow recovery; and (3) Missouri tort law does not provide a remedy for economic loss on the facts of the case.[1] CNS timely responded to the motion, alleging genuine issues of material fact precluded summary judgment on the grounds alleged by Phillips.

On May 21, 2002, the trial court conducted a hearing on the motion, after which it entered summary judgment for Mr. Phillips without making written findings of facts or conclusions of law. The court did not indicate on what grounds it granted summary judgment. After this court dismissed CNS's initial appeal for lack of a final judgment, CNS filed a "Motion to Determine Finality of Judgment" in the circuit court. The trial court subsequently made a docket entry indicating that "judgment on all 4 counts in [CNS]'s counterclaim is entered in favor of [Mr. Phillips] and v.[CNS]." CNS now appeals from that judgment.

## Standard of Review

 Our standard of review is set forth in *ITT Commercial Finance Corp.*, 854 S.W.2d at 376, which states, in relevant part:

When considering appeals from summary judgments, the [c]ourt will review the record in the light most favorable to [CNS,] the party against whom judgment was entered. Facts set forth by affidavit or otherwise in support of [Phillips'] motion are taken as true unless contradicted by [CNS]'s response to the summary judgment motion. We accord [CNS] the benefit of all reasonable inferences from the record.

Our review is essentially de novo. The criteria on appeal for testing the propriety of summary judgment are no different from those which should be employed by the trial court to determine the propriety of sustaining the motion initially. The propriety of summary judgment is purely an issue of law. As the trial court's judgment is founded on the record submitted and the law, an appellate court need not defer to the trial court's order granting summary judgment.

(Citations omitted.) As the movant for summary judgment under Rule 74.04, Phillips must establish that (1) there is no genuine dispute as to the material facts on which he relies for summary judgment, and that (2) based on these undisputed facts, he is entitled to judgment as a matter of law. *Id.* at 380. As the defending party, Phillips

can establish a *prima facie* case for summary judgment by one or more of the following three means: (1) showing facts that negate any one of [CNS's] elements facts; (2) showing that [CNS], after an adequate period of discovery, has not been able to produce, and will not be able to produce, evidence sufficient to allow the trier of fact to find the

---

1. From the record before this court, it does not appear that Phillips developed his argument with regard to the third ground at the trial level, nor does he develop it on appeal. Thus, we do not address the third ground raised in his motion.

existence of any one of [its] elements; or, (3) showing that there is no genuine dispute as to the existence of each of the facts necessary to support [Phillips'] properly pleaded affirmative defense. "Regardless of which of these three means is employed by [Phillips], each establishes a right to judgment as a matter of law."

*Sloss v. Gerstner,* 98 S.W.3d 893, 896 (Mo. App. W.D.2003) (quoting *ITT Commercial Fin. Corp.,* 854 S.W.2d at 381). Phillips primarily employs the second means, claiming in his motion (1) that no substantial evidence exists that moldy hay was delivered or that any "measurable" amount of moldy hay was fed to CNS's cattle and (2) that CNS's claim of decreased milk production was too speculative to allow recovery. Because the trial court's ruling does not specify a basis upon which summary judgment was granted, we must uphold trial court's decision if it is appropriate under either theory advanced by Phillips. *Southwestern Bell Yellow Pages, Inc. v. Robbins,* 865 S.W.2d 361, 369 (Mo.App. E.D.1993).

## Point I

In its first point on appeal, CNS claims the trial court erred in granting Phillips' motion for summary judgment on CNS's counterclaim because it established facts from which a determination could be made that moldy hay was indeed delivered and a measurable amount of the moldy hay was fed to its cattle. Thus, CNS contends there is a genuine dispute as to the material facts on which Phillips relies in his first ground for summary judgment.

Phillips claims he is entitled to summary judgment on CNS's counterclaim because CNS's evidence of whether the hay was moldy when delivered and whether it fed the cattle a measurable amount of the moldy hay was insufficient as a matter of law to make a submissible case. He contends that CNS relies solely on circumstantial evidence that does not "'point to the desired conclusion with such a degree of certainty as to make that conclusion reasonable and probable,'" nor does it "'rise above the stature of guesswork, speculation or surmise.'" (Quoting *Green v. Ralston Purina Co.,* 376 S.W.2d 119, 124 (Mo.1964) (reversing a jury verdict for the plaintiff because, among other things, the plaintiff's evidence "failed to prove that the ['Top Banana' broiler feed supplied by the defendant and fed to plaintiff's broilers] was unwholesome and that the unwholesome feed caused the production difficulties")). Phillips argues that CNS's evidence "'affords no more than equal support for either of two inconsistent and contradictory inferences as to the ultimate and determinative fact.'" (Quoting *Stark v. Am. Bakeries Co.,* 647 S.W.2d 119, 125 (Mo. banc 1983), superceded by statute on other grounds as stated in *Gloria v. Univ. of Health Scis.,* 713 S.W.2d 32 (Mo.App. W.D.1986)). He claims the inconsistent and contradictory inferences here are: (1) that (a) the hay was moldy when delivered, or (b) the mold developed after delivery; and (2) that (a) a measurable amount of moldy hay was fed to the cattle, or (b) because moldy hay was readily observable and smelled, CNS's inspection procedures picked up and segregated the only affected bales. Thus, Phillips insists "liability is left in the field of conjecture, and there is a failure of proof." *Id.* As explained below, we disagree.

In support of his claim, Phillips states in his motion that mold in hay can be seen and smelled, and when CNS's workers smelled moldy or caramelized hay, their normal policy was to break the bales open and inspect them. Phillips also cites the deposition testimony of Graham Coxhead, who was in charge of CNS's dairy herd's feed and waste disposal in 1998 and 1999.

Specifically, Phillips cites a portion of Mr. Coxhead's deposition wherein he admitted that he did not know how any moldy hay got past the inspections and into the cattle's feed, leading to an inference that the hay could not have been moldy when delivered or that no moldy hay could get past the inspections into the cattle's feed. CNS admits moldy hay is smelly and was not discovered in their inspection process, but it points out in its response that Mr. Coxhead further testified that while CNS "tried" to make a policy of looking at every truckload of alfalfa delivered to the dairy farm, due to time constraints and various other factors, they did not always get to do that. In reading the portion of Mr. Coxhead's deposition referenced by Phillips, it becomes clear that Phillips left out the remaining portion of Mr. Coxhead's comment; that is, Mr. Coxhead continued, "but it did," meaning moldy hay delivered by Phillips did get past the inspection process and into the cattle's feed.

Phillips further points out factual statements from the depositions of CNS's expert witnesses, animal nutritionists Drs. Charles Soderholm and Michael Brouk, concerning the fact that when they were called to the farm to investigate the problem with CNS's dairy cattle in late January or early February, the moldy hay was readily observable, and there was no evidence that the moldy alfalfa hay contained any mycotoxins. CNS admits such facts, but, as explained to the trial court by CNS's counsel during oral argument on Phillips' motion:

> [T]his is not a case where [CNS is] claiming that the mold in the hay made it toxic. It's a rather simple issue. It's not a situation where the cattle—the cows ate the hay and it made them sick and as a result of that their milk production decreased. The portions of the depositions of Dr. Brouk and Dr. Soderholm that we referred to in our brief

indicate that the problem with the moldy hay is: They won't eat it because it stinks. It's discolored. They—I forget what the term is, but they shove it across to the side and they don't eat it. And the way—the primary way that dairy cattle produce milk is by intake of food. And alfalfa is one of the many components of what they call dry matter intake.

The record reflects that in late January of 1999, CNS requested Dr. Soderholm consult on its dairy cattle's reduced food intake and milk production. On February 2, 1999, after investigation of the feed and observations of the cattle, Dr. Soderholm prepared a report of his results, in which he made several recommendations for CNS to implement immediately; one recommendation was to remove the moldy hay from the dairy herd's diet. Indeed, CNS did not deny the fact that Dr. Soderholm also recommended that the 1997 corn silage be removed from the feed. Phillips seeks to infer that because Dr. Soderholm recommended several key changes, CNS would not be able to prove the moldy hay caused the decreased milk production. However, as pointed out by CNS in its response to Phillips' motion, Dr. Soderholm also testified in his deposition that the moldy hay "was a major, major factor" in the cattle's reduced milk production. Dr. Soderholm further testified to a reasonable degree of medical certainty that the mold in the hay caused a decline in milk production. Dr. Brouk also testified that based on his actual observations of other similar circumstances in which he was involved, as well as his training and education as a dairy herd nutritionist, he, too, found the decline in milk production resulted, in part, from the inclusion of the moldy hay in the cattle's feed.

■ We have carefully reviewed the record on Phillips' motion for summary

judgment and CNS's response thereto. Both Phillips and CNS cite extensively to the depositions of Chris Powell, the dairy manager during the time in question, Mr. Coxhead, and CNS's expert witnesses Drs. Soderholm and Brouk, which contain testimony about the condition of the hay when delivered; what was fed; and the effect on CNS's cattle. Again, our review is de novo. In consulting the specifically referenced pages from these depositions and reviewing this evidence and reasonable inferences therefrom in a light most favorable to CNS, we find that Phillips' factual statements set forth in its motion, while admitted to in large part by CNS, simply do not establish that CNS has not been able to produce, and will not be able to produce, evidence sufficient to allow the trier of fact to find that the hay was moldy when delivered or that a measurable amount of the hay was fed to its dairy cattle. Despite Phillips' insistence to the contrary, "[t]he fact that only circumstantial evidence is presented on a material issue[, including causation,] is no bar to recovery." *Sanders v. Hartville Milling Co.*, 14 S.W.3d 188, 200, 202 (Mo.App. S.D. 2000). Although Phillips' citation to the record and arguments supporting his motion certainly may contradict CNS's evidence or present issues concerning the strength of or weight to be afforded CNS's evidence on these issues, those are fact issues to be settled by the trier of fact that we will not review or comment on at this stage of the proceedings. "Where the record reasonably supports any inference other than [that] necessary to support a judgment for the movant, a genuine issue of material fact exists and the movant's motion for summary judgment should be overruled." *J.M. v. Shell Oil Co.*, 922 S.W.2d 759, 761 (Mo. banc 1996). Said in another way, "[a] genuine issue of fact exists [thereby precluding summary judgment] where the record

contains competent evidence that two plausible but contradictory accounts of essential facts exist." *Ferguson v. Pony Express Courier Corp.*, 898 S.W.2d 128, 131 (Mo.App. W.D.1995). "It is not the truth of these facts which matter, but whether the facts are disputed." *Rogers v. Frank C. Mitchell Co.*, 908 S.W.2d 387, 389 (Mo.App. E.D.1995). "Questions of fact should be presented to the jury." *Id.* Here, the record, viewed in a light most favorable to CNS, contains sufficient evidence to establish genuine issues of material fact as to whether the hay was moldy when delivered and whether a measurable amount of the moldy hay was fed to CNS's cattle. Thus, Phillips is not entitled to summary judgment on the first ground raised in his motion.

Because we must uphold the trial court's summary judgment if it is proper on any grounds, we must also consider whether summary judgment is proper because, as claimed by Phillips in his motion, CNS's "claim of decreased milk production damage is too speculative to allow recovery."

### Point II

In its second point on appeal, CNS argues summary judgment was improper on the ground that its evidence of decreased milk production resulting from the moldy hay was too speculative, in that there was evidence, both lay and expert, that the moldy hay in the cattle's feed led to a measurable decrease in milk production.

Again, we note that our standard of review dictates that we review the record and reasonable inferences therefrom in a light most favorable to CNS. *ITT Commercial Fin. Corp.*, 854 S.W.2d at 376. As pointed out by CNS in its response to Phillips' motion, Dr. Soderholm testified that the moldy hay "was a major, major factor" in the cattle's reduced milk production. He also testified to "a reasonable

degree of scientific certainty" that the mold in the hay caused the decrease in milk production.

CNS also highlights the testimony of Dr. Michael Brouk, who concluded the moldy alfalfa hay in the cattle's feed was a factor in the loss of milk production at CNS's dairy farm and further quantified the amount of the actual milk production decline. Specifically, as referenced by CNS in its response, Dr. Brouk testified in his deposition:

A: In my opinion—this is how I would quantify it. Dry matter intake of most of the cattle increased by about six pounds per cow per day after the forages were changed. A conservative figure of pounds of dry matter intake per pound of milk would be one pound of dry matter intake equals two and a half pounds of milk. Some people will use a figure of one pound of dry matter intake is equivalent to 2.75 pounds of milk when we're talking about increasing dry matter intake. Okay? So if we use the 2.5 pounds of milk per pound of dry matter intake, we're looking at a potential of 15 pounds of milk. In other words, if dry matter intake went up 6 pounds, we would expect to see a minimum of a 15–pound increase of milk production. As I—my recollection is the farm actually saw—over a period of a month or 45 days after they made these changes, they actually saw [an] increase of six or seven pounds of milk per cow per day is my recollection of the situation. So when we try to define then, you know, what percent of the loss in production is due to alfalfa hay, what was due to corn silage, what was due to some of these other things [that they changed in CNS's cattle's diet], I guess in my opinion if we were looking at a 15–pound potential in milk production, conservatively we could say that—5 pounds to the hay, 5 pounds to the silage, and 5

pounds to other factors. It would have been nice to do an experiment, I suppose, and pull those things out one at a time. But unfortunately on a production farm that's not quite possible.

[Phillips' counsel] Q: Is that your opinion?

[Dr. Brouk] A: That's my opinion.

Q: Okay. Now that opinion—

A: And that's based on other situations. I've worked as a nutritionist for several years now in other situations I've had on other farms when we had hay with the mold quantity that this particular hay has in it—or had in it.

■ In response to CNS's second point on appeal, Phillips claims Dr. Brouk's opinion concerning the decreased milk production caused by the cattle's consumption of the moldy hay should be rejected because it is: (1) based on a faulty factual premise; and (2) not based upon generally accepted scientific principles. At the hearing on his motion, Phillips argued to the trial court that Dr. Brouk's opinion was based upon the assumption that "hay of similar quality to that that was found, discovered, these 20 bales that I was telling you about, that that was—that was fed exclusively for 30 to 35 days" and that "[t]here's no evidence that moldy hay was fed exclusively for 30 to 35 days." Thus, he argued, "that testimony, for whatever it's worth, is worth nothing because it's based upon a faulty factual assumption." However, as explained in our discussion of CNS's first point on appeal, CNS presented sufficient evidence establishing the existence of a genuine issue of material facts as to whether the hay was moldy when delivered and whether a measurable amount of the moldy hay was fed to CNS's cattle. Phillips has not shown as a matter of law that Dr. Brouk's opinion concerning the resulting decrease in milk production is

based on a "faulty" factual premise. Rather, the issue requires resolution of factual disputes, which are to be decided by the trier of fact, not this court on review of the summary judgment.

■ As for Phillips' challenge to Dr. Brouk's qualifications as an expert or admissibility of his testimony on damages, although he does state in his motion that "Brouk's opinion is based upon his own personal experience," Phillips did not raise the objections concerning Dr. Brouk's opinion that he now raises on appeal during any of the proceedings on his motion.[2] Thus, he is precluded from raising the issue on appeal. *See Gal v. Bishop*, 674 S.W.2d 680, 683 (Mo.App. E.D.1984) (in which the court "[saw] no reason why the well-established rule that the failure to object to the foundation or qualifications of expert testimony at trial precludes the raising of such issues on appeal should not apply with equal force to summary judgment" (citations omitted)). However, because we are remanding to the trial court and this issue may arise again, we note that both parties cite the standard for admission of expert testimony set out in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923). The Missouri Supreme Court recently reaffirmed its holding in *Lasky v. Union Electric Co.*, 936 S.W.2d 797 (Mo. banc 1997), "that the standard for the admission of expert testimony in civil cases is that set forth in section 490.065.... To the extent that civil cases decided since *Lasky* apply *Frye* or some other standard, they are incorrect and should no longer be followed." *State Bd. of Registration for Healing Arts v. McDonagh*, 123 S.W.3d 146, 149 (Mo. banc 2003).

■ Phillips insists CNS's evidence of decreased milk production damage is too speculative. As pointed out by Phillips, "[l]ost profits are recoverable when they are made reasonably certain by proof of actual facts which present data for a rational estimate of such profits. Recovery is prohibited when there is uncertainty or speculation as to whether the loss of profits was the result of the wrong." *Jarman v. Griggs*, 31 S.W.3d 465, 467 (Mo.App. W.D.2000) (internal quotation marks and citations omitted). Courts have been stricter in their evaluation of the sufficiency of evidence to warrant recovery for lost profits "[b]ecause a multitude of variable factors can enter into the composition of such damages." *Brown v. McIBS, Inc.*, 722 S.W.2d 337, 341 (Mo.App. E.D.1986).

As repeated throughout this opinion, we must consider the evidence in a light most favorable to CNS to see if it is sufficient to survive summary judgment. In his motion, Phillips cites the deposition testimony of Christopher Powell, the dairy manager, and Exhibit 6 to that deposition, which is a detailed chart Mr. Powell helped prepare to aid in quantifying the decrease in milk production during the relevant time period. The facts cited by Phillips in his motion, which were not denied in substance by CNS, concern the variation of the average number of cows being milked during the relevant period when milk production was down and various issues regarding the calculation of the decreased milk production. In reviewing this evidence in favor of CNS, we find that Mr. Powell testified, and the chart reflects, that prior to receiv-

---

**2.** Although it appears from CNS's Memoranda in response to Phillips' motion for summary judgment that Phillips filed a separate legal memorandum in support of his motion with the trial court as required by Rule 74.04(c)(1), such suggestions are not a part of the record on appeal, so we cannot tell from the record before us, which is all we consider, whether Phillips advanced this argument concerning Dr. Brouk's qualifications as an expert at the trial court level.

ing and incorporating the moldy hay into the cattle's feed, CNS's approximately 2500 cattle[3] produced on average 56.58 pounds of milk per cow, per day. Once the moldy hay was fed, the cattle's milk production dropped to an average of 47 or 48 pounds per cow, per day. The chart reflects a total loss in milk production of 1,164,679 pounds of milk during the period of the week ending December 27, 1998, to the week ending February 15, 1999, which is the period for which CNS seeks damages against Phillips. Mr. Powell further testified that, based upon the average price of milk from their "Dairy Farmers of America" statements for those three months, the lost milk production during that time period equates to a loss of $226,650.03.

Phillips further points out that Dr. Brouk testified that when translating moldy hay to pounds of milk lost, "we maybe enter a bit of gray area." CNS admits such fact. However, the mere fact that a "gray area" arises does not necessarily lead to the conclusion that all evidence of the decreased milk production resulting from the moldy hay is too speculative. As set forth above, after making this comment, Dr. Brouk went on to specifically quantify the amount of reduced milk production attributable to the moldy hay in the feed, which could be used in conjunction with Mr. Powell's testimony regarding the dollar amounts to establish CNS's damages.

While the facts cited by Phillips in his motion and admitted by CNS may affect the weight of this evidence or contradict some of it, we find CNS produced at least enough non-speculative evidence to create a genuine issue of material fact concerning the amount of milk production it lost from

the moldy hay in the feed. Thus, summary judgment is not appropriate on that ground, either.

## Conclusion

Because CNS presented sufficient evidence to demonstrate genuine issues of material fact on the grounds alleged by Phillips in his motion for summary judgment, the trial court erred in entering summary judgment on CNS's four-count counterclaim. Accordingly, we reverse the judgment and remand to the trial court.

BRECKENRIDGE, P.J., and SMITH, J., concur.

---

3. The "Production Losses" chart reflects that the average number of cows milked varied from week to week.