APTED–HULLING INC. and Cheshire Inn Motor Hotel, Inc., Plaintiffs/Respondents,

v.

L & S PROPERTIES, LTD. and John E. Lueders, Defendants/Appellants.

No. ED 87862.

Missouri Court of Appeals, Eastern District, Division One.

July 10, 2007.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 15, 2007.

Application for Transfer Denied Oct. 30, 2007.

---

James J. Virtel, St. Louis, MO, for appellant.

Noel A. Sevastianos, Michael F. Jones, Clayton, MO, for respondent.

CLIFFORD H. AHRENS, Presiding Judge.

L & S Properties, Ltd. and John Lueders (collectively "Tenants") appeal from the judgment of the trial court awarding Apted–Hulling, Inc. and Cheshire Inn Motor Hotel, Inc. (collectively "Apted–Hulling") damages for breach of contract in the amounts of $244,236.02 for lost profits and $11,103.55 for payment of indebtedness to the St. Louis Metropolitan Sewer District ("MSD"), plus costs. We affirm as modified.

Viewed in the light most favorable to the judgment, the facts are as follows. On April 12, 1989, Apted–Hulling, which owns the Cheshire Lodge hotel and the Cheshire Inn restaurant, real properties connected by a porte-cochere, entered into a twenty-five year lease ("Lease") with John Lueders and Don Schuessler to operate the Cheshire Inn. Under the terms of the Lease, the Cheshire Inn was to provide room service and breakfast service on a continuing basis to guests of the Cheshire Lodge, as well as other foodstuffs used by the hotel. The tenants also agreed to continue the same hours and days of operation for the Cheshire Inn as existed at the time of the execution of the lease. The Lease was assigned to L & S Properties, Inc. on April 14, 1989. Following the

death of Schuessler in 1991, Lueders served as president of L & S Properties and general manager of the Cheshire Inn until 2006.

Apted–Hulling filed a petition in May 2004, subsequently amended, that alleged that Tenants repeatedly breached the Lease between January 1999 and the inception of the lawsuit in a number of ways. These breaches included: failures to provide room service to guests of the Cheshire Lodge, and/or to do so adequately; failures to provide breakfast service at the Cheshire Inn to guests of the Cheshire Lodge; failures to pay the minimum amount of rent required under the Lease; failures to pay rent due in a timely fashion; and failure to pay the sewer bills. Apted–Hulling further alleged that these breaches by Tenants resulted in numerous guests leaving the Cheshire Lodge and in guests deciding against staying there, causing lost profits and loss of goodwill and business reputation. Apted–Hulling sought to terminate the Lease, to regain possession of the premises, attorneys fees and costs, double rent for unlawful detainer, damages for lost profits and loss of business reputation and goodwill.

A bench trial was held in December 2005. A number of witnesses testified, and exhibits were introduced into evidence. Apted–Hulling presented evidence of different breaches of the Lease by Tenants and of damages that it suffered as a result. The trial court issued findings of fact and conclusions of law on February 14, 2006.

The trial court found that Tenants had breached the Lease in a number of significant ways. It found that Tenants showed little interest in running a restaurant to accommodate guests of the Cheshire Lodge, and that the increased bar operations of Tenants led to problems with the Cheshire Lodge. In addition to finding that Tenants failed to provide adequate services to guests of the Cheshire Lodge, the trial court also found that Tenants did not maintain the premises that they controlled in a clean or attractive condition in violation of the Lease, and that Tenants failed to show that Apted–Hulling did not maintain the Cheshire Lodge well. It specifically gave no weight to Tenants' allegations that the Cheshire Lodge was in poor condition. The trial court ordered that the Lease be declared void and that Apted–Hulling be given immediate possession of the real property of the Cheshire Inn.

The trial court found that Apted–Hulling sustained lost profits "as a direct and proximate result of the [Tenants]' multiple breaches of the Lease[.]" It further found that these breaches led directly to the Cheshire Lodge's loss of business travelers, and was "evidenced and well-documented by a massive decrease in single occupancy rooms occupied between 1991 and 2004[,]" and referenced Exhibit AH14. It concluded that damages from lost profits proximately resulting from the breach of contract were shown with "reasonable certainty." The trial court found it had been proven that 6,543 fewer single occupancy rooms were rented in 2004 than in 1991, and that the use of the second lowest revenue per guest figure for the period of 1991 to 2004 from AH14, $47.68, was a conservative and reasonable figure to calculate damages. The trial court concluded that the lost profits for 2004 were $124,788.09, based on multiplying the 6,543 fewer single rooms rented by $47.68 in revenue per guest by 40 percent, the net profit margin for the Cheshire Lodge. The trial court also found that Apted–Hulling proved that it had rented 6,263 fewer single occupancy rooms in 2003 than in 1991, and applied the same formula to calculate lost profits for 2003, and concluded that lost net profit for that year was

$119,447.93. It found that Apted–Hulling lost a total of at least $244,236.02 in lost net profits between January 1, 2003 and December 31, 2004 "as a direct and proximate result of [Tenants]' multiple breaches of the Lease, and that this calculation is 'reasonably certain.'" The trial court awarded Apted–Hulling damages in the amount of $244,236.02 for lost profits and $11,103.55 for repayment of indebtedness to MSD, plus costs.

Tenants now appeal from the trial court's judgment awarding damages.

■■■ On review of a court-tried case, we will sustain the judgment of the trial court unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously states or applies the law. *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976). We review the evidence in a manner favorable to the judgment, disregarding contradictory evidence, and we will defer to the trial court even if the evidence could support another conclusion. *Legacy Homes Partnership v. General Electric Capital Corp.,* 50 S.W.3d 346, 356 (Mo.App.2001). As the trier of fact, the trial court determines the credibility of witnesses, and is free to believe or disbelieve all, some, or none of a witness's testimony. *Beery v. Shinkle,* 193 S.W.3d 435, 439 (Mo.App.2006).

In the sole point relied on, Tenants contend that the trial court erred in awarding damages to Apted–Hulling for lost profits and for non-payment of the MSD bill because the judgment was not supported by substantial evidence in that the testimony regarding lost profits was "purely speculative and not based on actual facts," and undisputed evidence showed that Tenants paid the MSD bill in full on December 14, 2005.

■■■ Apted–Hulling concedes in its brief that the MSD bill at issue was paid. Rule 84.14 allows an appellate court to "give such judgment as the court ought to give. Unless justice requires otherwise, the court shall dispose finally of the case." We need not remand on review, but may render the judgment that the trial court should have rendered. *Manula v. Terrill,* 136 S.W.3d 528, 530 (Mo.App.2004). Where there is no dispute as to the facts, but rather only as to their legal significance, it is an appropriate case for the appellate court to render such a judgment. *Id.* Apted–Hulling concedes that Tenants did ultimately pay all of the MSD bill at issue. Accordingly, we modify the trial court's judgment and reduce the damages awarded to Apted–Hulling by $11,103.55.

■■■ The only remaining issue before this Court is whether or not the trial court erred in awarding damages to Apted–Hulling for lost profits. Lost profits are recoverable in a variety of breach of contract and tort cases. *Ameristar Jet Charter, Inc. v. Dodson Intern. Parts, Inc.,* 155 S.W.3d 50, 55 (Mo. banc 2005). A party seeking an award of lost profits must introduce evidence that provides an adequate basis for estimating the lost profits with reasonable certainty. *Id.* at 54. While an estimate of anticipated profits must be based on more than mere speculation, uncertainty regarding the amount of profits that would have been made does not prevent a recovery. *Id.* at 54–55. A claimant must prove the fact of damages with reasonable certainty; however it is not always possible to establish the amount of damages with the same degree of certainty. *Id.* at 55.

In some cases, the evidence weighed in common experience demonstrates that a substantial pecuniary loss has occurred, but at the same time it is apparent that the loss is of a character which defies exact proof. In that situation, it is reasonable to require a lesser degree of

certainty as to the amount of loss, leaving a greater degree of discretion to the court or jury. This principle is applicable in the case of proof of lost profits. *Id.* (quoting *Ranch Hand Foods, Inc. v. Polar Pak Foods, Inc.*, 690 S.W.2d 437, 444–45 (Mo.App.1985) (internal citations omitted)).

■ Margaret Piot ("Controller") was the sole witness for Apted–Hulling concerning lost profits resulting from breaches by Tenants. Controller worked for Apted–Hulling since 1977, and as of the trial date she had been the controller of the company in excess of twenty years. She stated that the Cheshire Lodge's target clientele were business travelers, people who ordinarily would rent single-occupancy suites. Controller testified regarding data from Exhibit AH14, Cheshire Lodge Room Statistics 1991–2004, which was admitted into evidence. She testified about the business activity of the Cheshire Lodge from 1991 to 2004, and stated that in 2004 the hotel rented 6,543 fewer single rooms than it had rented in 1991. For the year 2003, the hotel had rented 6,263 fewer single-occupancy rooms than in 1991. Controller calculated gross profits lost for 2004 based on a chart of revenue per guest for the period from 1991 to 2004, using $47 per guest as a basis, which she stated was low, less than the second-lowest amount on AH14 for guest revenue. She multiplied this number by the number of fewer single-occupancy rooms rented in 2004, and got an approximate gross revenue loss for 2004 of $307,521. She stated that the profit margin of the Cheshire Lodge was forty percent of gross revenue.

Controller stated that the loss of single occupancy rooms was due entirely to the actions of Tenants in their operation of the Cheshire Inn. She testified that Apted–Hulling had numerous complaints from business customers that they could not get the services that they needed or wanted. Controller also averred that the increase in guests at the Cheshire Lodge from 1991 to 1996 was not due to the quality of service provided by Tenants, but rather from the efforts of Apted–Hulling. Single occupancy rentals decreased every year thereafter. On cross-examination Controller denied that the premises of the Cheshire Inn were "a shambles" and that it was in good condition. She did not recall any complaints about the service or condition of the Cheshire Lodge itself. Controller opined that the hotel did not have any direct competition because of its location. She was not aware of any other hotels within three miles of the Cheshire Lodge, though Tenants' attorney listed several hotels within that radius. Upon further questioning, Controller stated that she did not consider the Red Roof Inn or the Ritz–Carlton competition, but conceded that the Sheraton Clayton Plaza Hotel, the Clayton on the Park Hotel, and the Daniele Hotel were competitors of the Cheshire Lodge. Controller testified that she did not consider the number of corporate headquarters that either had departed from or relocated to St. Louis as affecting room occupancies, and admitted that she did not know if the number of business headquarters had increased or decreased over the years. She said she did not know if the Arena and its demolition had affected room occupancies, though she imagined that events at the Arena could have brought guests to the hotel in the past.

Tenants contend that Controller's testimony regarding lost profits is speculative and that there were no "actual facts" to support her conclusion that single occupancy guests did not stay at the Cheshire Lodge because of lack of room service or restaurant service. Tenants cite to *Jar-*

*man v. Griggs*, 31 S.W.3d 465 (Mo.App. 2000), as an instructive case in which there was insufficient evidence of lost profits. In that case, Jarman, the operator of a cocktail lounge, sued his landlords seeking lost profits from his business because the landlords waited nearly a year to reroof the building and repair the leaky roof. *Id.* The trial court found that while Jarman did lose some business due to the roof, he did not meet his burden of establishing the amount of damages that he claimed as lost profits. *Id.* He appealed, contending that the judgment was against the weight of the evidence. *Id.* at 466. A CPA testified as an expert for Jarman that businesses normally increase in sales after the first year, but tenant's sales declined instead. The CPA stated that Jarman's bar business should have increased by nine percent in 1995 and by a further six percent in 1996. The CPA admitted that he could not say that the leaky roof was the only cause of any lost profits, and did not identify when the tenant began to lose sales, nor did he rely on the tenant's monthly financial statements. The trial court performed its own review of the financials, and found that there was no pattern of lost sales, and further found that the CPA's reports were inconsistent on a monthly and yearly basis. It also found that the landlord's testimony that Jarman had told her his bartender was stealing from the business was credible. The trial court found that Jarman's business records did not present a basis for making a rational estimate of lost profits. The appellate court affirmed the judgment for the defendants and held as follows:

> Jarman's expert provided the circuit court with calculations indicating that Jarman's business should have increased its sales in 1995 and 1996, but the expert acknowledged that he could not say that lost profits resulted directly from the leaking roof or identify in which months

Jarman's business began losing sales. The expert admitted that a number of other business decisions could have caused Jarman's lost profits. The circuit court believed that Jarman's bartender was stealing from the business during this same period and that this affected profits. Hence, the circuit court's conclusion that Jarman did not provide a sufficient basis for its making a "rational estimate" of lost profits was not against the weight of the evidence. Had the circuit court have calculated its rational estimate of lost profits on this evidence, it would have been engaging in pure speculation. We, therefore, affirm the circuit court's judgment

*Id.*

The present case is not like *Jarman.* In *Jarman,* the trial court granted judgment in favor of the defendants and did not award any damages for lost profits, and Jarman was seeking to reverse that judgment on the basis that it was against the weight of the evidence. *Id.* at 466. This is a different standard of review than in the present case, wherein the argument is that there is insufficient competent evidence to sustain the trial court's judgment. In the case before this Court, there were not claims that business failed to increase, but rather that it actually, measurably decreased. Jarman's expert admitted that he could not state that lost profits were directly caused by the leaky roof, and that many other business decisions made by Jarman could have caused profits not to materialize. *Id.* at 466–67. The expert also lacked credibility in his failure to identify in what months Jarman lost sales. *Id.* The trial court also believed that Jarman's employee was stealing from the business, thereby affecting profits. *Id.* at 467. In the present case, the trial court found Controller credible, while finding some of Tenants' witnesses were not credible. Un-

like Jarman's expert, Controller testified that Tenants' breaches of the Lease were the only cause of the decrease in single occupancy business, and that the Cheshire Lodge had a number of complaints about the lack of food service. The trial court did not find that there was credible evidence that the Cheshire Lodge was in poor condition, but did find that Tenants did little, if anything, to accommodate guests of the Cheshire Lodge, and that its actions in emphasizing the bar over the restaurant aspect of the Cheshire Inn was detrimental to the business of the hotel because of late night noise and trash. It is a reasonable inference that Tenants had little to do with the increase in single occupancy business at the Cheshire Inn from 1991 to 1996, and that its failures to abide by the Lease was the primary cause of the decrease in single occupancy business thereafter. Tenants' cross-examination of Controller about other possible causes for a decrease in single occupancy rentals might affect the weight given to her testimony regarding Tenants' breaches as the sole cause of Apted–Hulling's lost profits, but it does not make the evidence overly speculative. *See Phillips v. CNS Corp.*, 135 S.W.3d 435, 441–42 (Mo.App.2004). Point denied.

The judgment of the trial court is modified to reduce the damages awarded to Apted–Hulling by $11,103.55. The judgment, as modified, is affirmed.

MARY K. HOFF and NANNETTE A. BAKER, JJ., concur.